No. ----------

First Circuit Appeal.

## SUCCESSION OF HOMER DAVID v. JOSEPHINE L. RICHARD.

(December 30, 1924, Opinion and Decree.)

(*Syllabus by the Editor.*)

1. **Louisiana Digest, Taxation—Par. 376.**

Where a colored woman living on a farm gives a prominent white man money to pay her taxes and he allows the property to be sold at tax sale, buying it in for himself and where for seven years after this until his death the white man does not pretend to be owner of the property allowing the colored woman undisputed possession, the tax sale to the white man was a fraud and a nullity, he having purchased it as agent of the colored woman.

2. **Louisiana Digest, Appeal—Par. 630; Evidence—Par. 344.**

The evidence of a colored woman, a party to this suit was amply corroborated by other testimony and circumstances which makes it worthy of belief. The judgment of the trial court being against the weight of evidence is therefore reversed.

3. **Louisiana Digest, Evidence—Par. 1.**

Courts of justice can take judicial notice of the status of those who belong to the colored race.

Appeal from the Parish of Acadia, Hon. W. W. Bailey, Judge.

This a suit to gain possession of property fraudulently purchased at a tax sale. There was judgment for plaintiff and defendant appealed.

Judgment reversed.

Chapuis & Chapuis, of Crowley, attorneys for plaintiff, appellee.

W. J. Carmouche, of Crowley, attorney for defendant, appellant.

MOUTON, J. C. Wimberly in his capacity of administrator of the succession of Homer David, sues defendant for the ownership of a 26-acre tract of land situated in Acadia Parish. He alleges that defendant is in possession thereof, and prays for the restoration of possession to the succession.

The District Judge rendered judgment in favor of plaintiff from which defendant prosecutes this appeal.

The land was adjudicated to Homer David, June 5th, 1915, at tax-sale for the taxes of 1914, which amounted to $13.35. Defendant testifies that she gave the money to Homer David to pay taxes of 1914. The year before, she says, Pierre Higginbotham paid the taxes on the property for her, and that in 1923, they were paid by Ben. Daigle. Homer David died March 22nd. 1922. Defendant says, as a witness, that her taxes on this land were paid for her with her money by Homer David, practically to the year of his death; that she either handed over to him the money to pay these taxes, or if he paid them with his own funds he was re-imbursed by her for his outlay.

Her son, Theodore Richard, says in the Spring of 1915, at his mother's home, he

heard Homer David say he was going to Crowley and could pay her taxes, and she would refund him when he came back. He says, one of his mother's "big troubles" was to pay her taxes; that every year Homer David and his mother spoke about these taxes and he often heard David tell her not to trouble herself about her taxes. Her daughter, Amelia Richard, testifies that her mother having heard her property was for sale for taxes, sent for David who, at her request came to her home; she told David that Gay, a neighbor, had told her the property was advertised and she inquired from David how that had happened. David said that it was an error; that she asked him what was the amount of her taxes, he told her and that she paid him. Her brother, Theodore, testified on this subject, saying David said he would pay her taxes and she would refund him the money. In this respect there is a discrepancy in the evidence of these two witnesses. Amelia says, she heard conversations between David and her mother in reference to these taxes. In this regard the testimony of the brother and sister are in accord. Amelia also says every year David would tell her mother he had paid her taxes and which is substantially what her brother testified to.

Defendant is a colored woman the widow of Theogene Richard, a white man. She was married to him after several years of illicit cohabitation, and the children born of that unlawful union, including Theodore and Amelia, were subsequently legitimated in a contract of marriage entered into between defendant and Richard. The two children who testified and the mother likewise are illiterate and ignorant. In their testimony they were a little confused in the references they made to the respective years in which they said Homer David paid these taxes for defendant. Their testi-

mony is not just alike in all particulars, not stereotyped, and does not show that these witnesses were drilled or had undergone any preparation for the purpose of concocting a fabricated story. The narrative they gave of the incidents to which they testify is simple, not tortuous or evasive, and is not suggestive of a conspiracy on their part, manufactrued to bolster up a false claim against one who was dead and who could not contradict their testimony. The testimony of these witnesses shows, however, that the taxes on the property in question were paid by David for defendant with money handed him by her or with his money for her and for which he was reimbursed, for the year 1914, and practically to the year of his death, in 1922, with the exception of the two years when these taxes were settled for by Pierre Higginbotham and Ben. Daigle, as was explained by defendant.

The assessment rolls of the Parish of Acadia show that the property was assessed to Homer David in 1916; also in the name of defendant for that year. It is explained, however, that it was so assessed to defendant in 1916, after David had acquired, because the period of redemption which was running in favor of defendant had not yet expired. These rolls show further that in the two following years, 1917, and 1918, the property was assessed in the name of both David and defendant. For 1919 and 1920, it was assessed to David; and in 1921, in the name of defendant. Little valuable information can be derived from such irregular and variable assessments as to the indicia of ownership after the alleged acquisition by David. The record shows that the taxes for the year 1917, paid Jan. 26th, 1918, due by defendant on this property were settled on the same day Homer David's taxes were paid. The record does not show that David paid these taxes for

defendant except as this is supported by her testimony and that of her children, hereinabove discussed. It is strange, however, that they were paid on the same date that David's taxes were paid; and if David paid them for defendant, it would also appear quite singular, that he should have paid for both on the same property. In the light, however, of the facts which will be hereinafter discussed it will be seen that David, after his alleged purchase, never made a clear-cut claim of ownership to this property and seems at different times to have been in a wavering state of mind or uncertain as to his title thereto. This may explain the state of confusion which appears in these assessments, and this double entry of payment of these taxes as before stated. Defendant was living at the time these payments were made and is now living near a small town known as Church Point, situated about ten miles from Crowley, she says, she never went to Crowley to pay her taxes and entrusted their payment to David for almost all of these years. It• is incontrovertibly established by the record that it was customary for prominent men from Church Point to pay the taxes for other people in that community. Homer David had once been a candidate for or had been mentioned for the office of sheriff, and was, no doubt, a man of some prominence; and hence, there is nothing surprising in the claim of defendant that he had been selected by her to perform the little neighborly service of attending to the payment of her taxes. The proof shows that June 24th, 1905, 245 acres of land, which defendant then owned, were bought by Dr. Rufus C. Webb at tax sale. The record also shows that in a deed executed later, in July 1905, and signed by David as the agent of defendant, that this property was redeemed for defendant by Homer David, acting as her agent, and in which it was declared

that David was the undertutor of her children. This deed, unquestionably, shows that in 1905, Homer David, was the agent of defendant, and as such, was entrusted by her with the authority to redeem her property which had been adjudicated at tax sale. The proof shows, indisputably, that the cordial relations which existed between these parties in 1905, continued without a break to the time of David's death in 1922. As such were the relations existing between David and defendant in 1905, and had so continued to the demise of the former in 1922, is it not but fair and reasonable to believe that in the years prior to 1915, and subsequent thereto, as was testified to by defendant, her son and daughter, that David was again entrusted with the duty of paying the taxes of defendant on the land in contest. The testimony of these witnesses in this respect is in harmony with the proof that it was customary for prominent citizens of Church Point to attend to the payment of taxes for others; and is strongly corroborated by evidence of the relations of trust and confidence which had always existed between defendant and David. We say, to the time of his death as it was only sometime thereafter that defendant was sued to be dispossessed of the land by the administrator of David's estate, and for the first time, was apprised that her property had been bought at tax sale by David. Defendant testies that Homer David asked her to allow him to put down an irrigation well on the land in question; that he said if she permitted him to do so she could plant rice, and he would furnish water for her rice, if she wanted to plant any. She says, she declined the offer. Theodore and Amelia, son and daughter, say they heard when David sought this permission to dig a well, and when their mother refused.

On cross-examination counsel for the ad-

ministrator asked defendant if she thought David was so anxious to get her land that he was willing to furnish the water for all the property. To this question her answer was "yes". She had not, however, in her statement about the well, said that the proposition for the privilege asked by David included the obligation of watering all of her land. Her son, Theodore, testifying on this subject, says, that David said to him if he got his mother to consent to the putting of the well, "the first year you will pay no water rent." This clarifies the situation and explains the reasonableness of the offer.

This offer was made after David had become the tax adjudicatee of the property. If he had been a bona fide purchaser and owner, it is not to be believed for an instant that he would have been so solicitous to obtain the permission of this old colored woman for the authority to drill a well on this land. This old woman, 74, at the time this suit was tried, had been living on this property for a period of 51 years. In the Fall of 1922, more than seven years after the alleged tax-purchase of David, the administrator notified her to turn the property over to the estate. It was the first time an attempt was made to disturb her possession in law or in fact. It is shown, and beyond question, that in 1915, the year it is claimed David acquired, prior thereto, and subsequently thereto, at the time of his death in March 1922, and even during the succeeding Summer, she continued in unquestioned possession of this property, renting parts of it to tenants and collecting rents, without turning over to David one cent of these revenues. It is not to be believed that David would have allowed defendant to enjoy all the fruits of this property if in his conscience he had considered himself the true owner thereof. These are facts which spring from the record and are not dependent for proof of their existence on extra judicial admissions from the dead.

They speak for themselves, and reveal such a situation of inaction on the part of David which can not be reasonably explained except as showing that he hesitated to assert his ownership. Such facts as these make it doubtful that he felt he was the real purchaser of this property. Sometime before his death, Homer David suffered financial reverses. He was pressed for debts and in 1922, or possibly in 1921, he gave a mortgage to the Commercial Bank of Church Point on all available property he owned, excepting some woodland, a character of assets, upon which the Bank made no loans. Loyd Franquez, cashier of the bank, says, David gave the description of the property covered by the mortgage. Nevertheless, it appears that he did not include therein, the property in dispute, good valuable prairie land, said by the administrator to have been worth $1200.00 when the suit was brought, and $2000.00 when it was tried. Several witnesses called by the administrator said that Homer David was always considered a man perfectly honest, truthful and entirely reliable. Defendant and her witnesses also frankly admit that they so considered him, until they found out after his death that he had placed this property in his name as a purchaser, and had thus revealed the betrayal of his trust as the agent of the defendant. If he was, in reality, the honest man as he is represented to have been by the witnesses for the estate, the question arises why did he not include the tract in dispute in the mortgage he executed in favor of the bank? The answer would naturally be, judging from the facts of this case, and his unaccountable failure to assert his ownership after his pretended purchase, that his mind still wavered as to whether he would go to the extent of placing a mortgage on the

land of which he appeared the purchaser. Strange to say, in this act of mortgage, David declared he had acquired this land from defendant and that he had bought it at tax-sale. He may not have known much about business but he could not have failed to realize that if he had bought it from defendant it would have been his property, and that he could not have acquired his own land at a sheriff's sale. Here, again the same hesitation to assert his ownership appears in his declaration in the deed, demonstrating an irreconcilable position. Such a declaration is not consistant with the rights of ownership to a property legitimately acquired. If this declaration stood alone, some reason might be advanced in justification for it, but taken in connection with the facts and cirsumstances hereinabove detailed, such a declaration can not be explained except as the results of one whose ownership was not honest and real Counsel refers the court to the familiar rule that evidence of the extra judicial admissions of a dead man out of the presence of witnesses, is the weakest kind of all testimony, Calhoun vs. McKnight, 44 La. Ann. 575, 10 South. 783. There can be no question of the correctness of this doctrine, so often applied. He also refers to the following found in the same case: "Fraud is never presumed. While it may be inferred from circumstances, these must be of a character clearly convincing the judicial mind in order to support the charge of an offense closely akin to crime."

Here, the admission of the deceased in reference to the payment of the taxes for defendant as claimed by her, were made in the presence of two witnesses besides the defendant. Such admission as appear in the instant case could not be entirely disregarded under a strict application of the first part of the quotation above reproduced. We would not, however, accept the testimony of defendant and her witnesses as proving these extra-judicial admissions standing alone, and without the support of corroborating circumstances.

That fraud is never presumed is also an axiom of the law. No one disputes this. But, says the court in the case cited, fraud may be inferred from circumstances clearly convincing the judicial mind. Here, not only the circumstances but also many facts in the case, silent but potent, elaborately recited and exhaustively considered hereinabove, are irresistibly convincing that Homer David, though acting as the agent of the defendant to pay the taxes on this land for her, acquired the property in his name at a tax-sale and in violation of his obligation as a fiduciary.

Counsel for the administrator makes a spirited attack on defendant as being unworthy of belief because she had many children for Theogene Richard, a white man, before she was married to him. A marriage ceremony was however, performed many years after they had lived in concubinage, uniting them in the bonds of lawful wedlock. He makes a like attack on the testimony of Amelia, because she entered into an illict union with Higginbotham, also a white man. It is but natural to aspire to a higher scale in life, and strong must be this feeling in the hearts of those of an inferior race. If such as these overstep the rules of sexual morality in thus attempting to rise higher in their social status, though their conduct in so doing can not be overlooked by the law, still, its severity should not be visited on them to the extent of justifying the conclusion that because of their sexual derelictions, their testimony should be taken as unworthy of belief. Courts of Justice can take judicial notice of the social status of those who belong to the colored race, and can not be expected to apply the rule invoked by

Counsel, otherwise few indeed would be those of that race that would be accorded belief in the trial of judicial cases.

Counsel for the administrator has presented a well prepared brief, and dwells with unusual warmth on this phase of the testimony given in support of the kindness, honesty and straightforwardness of the deceased, and stresses the argument that one of that character could not have been capable of committing a breach of trust, an offence "closely akin to crime". No doubt, he enjoyed that reputation to the time that he passed to the great beyond, not only in the estimation of the witnesses who testified for the estate, but also in that of the defendant and her children, witnesses in the case. This court is called upon to perform an unpleasant duty in this case, but must accomplish its task in compliance with law and justice. In so doing, not wishing to touch upon the character of the dead, will close with the well known lines:

"No farther seek his merits to disclose, or draw his frailties from their dread abode."

The judgment must be reversed.

It is therefore ordered adjudged that the judgment appealed from be avoided and annulled; and that plaintiff's demand be rejected; that the alleged purchase by Homer David of the land in contest, at tax sale June 5th, 1915, be and is hereby decreed to have been acquired for defendant; that the defendant is hereby decreed the owner thereof, and entitled to the possession of said land; and that the alleged taxtitle of record in the name of Homer David, be cancelled from the public records of the Parish of Acadia; and, that plaintiff pay all cost of suit.